Filed 10/7/24  Irvine Ranch Water Dist. v. Orange County Water Dist. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| IRVINE RANCH WATER DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ORANGE COUNTY WATER DISTRICT, et al.,<br><br>    Defendants and Appellants. | B329089<br><br>(Los Angeles County Super. Ct. Nos. BS168278, BS175192, 21STCV33390, 22STCV22517) |
| GOLDEN STATE WATER COMPANY,<br><br>    Cross-Complainant and Appellant,<br><br>v.<br><br>IRVINE RANCH WATER DISTRICT,<br><br>    Cross-Defendant and Respondent. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Mitchell Beckloff, Lawrence Riff, and Amy Hogue, Judges.  Affirmed.

Alston & Bird, Edward J. Casey, and Matthew C. Wickersham for Irvine Ranch Water District.

Rutan & Tucker, Joseph D. Larsen, and Jeremy N. Jungreis for Orange County Water District.

Meyers Nave, Gregory J. Newmark, and Kiana Amiri-Davani for East Orange County Water District, Yorba Linda Water District, and Mesa Water District.

Brownstein Hyatt Farber Schreck, Scott S. Slater, Christopher R. Guillen, and Jessica L. Diaz for Golden State Water Company.

Anaheim City Attorney's Office, Alison M. Kott, and Daniel J. Payne; Best & Krieger, Jeffrey W. Dunn, and Wendy Y. Wang for City of Anaheim.

Irvine Ranch Water District (Irvine Ranch) is one of several entities that extract water from the Orange County Groundwater Basin (the Basin). The Orange County Water District (OCWD) manages the Basin pursuant to the Orange County Water District Act (the Act).[1] One of OCWD's statutorily-provided tools for managing the Basin is a fee assessed on groundwater that a producer pumps in excess of an OCWD-set ratio of groundwater to groundwater *plus* water from "supplemental sources." (§ 40-31.5, subds. (a), (c)(2), (j)(2).) The trial court found the statutory definition of "supplemental sources" does not include recycled water and Irvine Ranch appeals that determination. In a consolidated cross-appeal brought by Golden State Water Company (Golden State), we also consider a separate issue: whether the trial court correctly decided, via a motion for judgment on the pleadings, that Golden State has not stated (and cannot by amendment state) its own affirmative claim for water rights independent of a groundwater claim that Irvine Ranch made, but later abandoned, pursuant to a 1933 judgment.

## I. BACKGROUND

### A. *Pertinent Provisions of the Orange County Water District Act*

"To maintain an adequate level of groundwater in its territory and protect groundwater quality, [OCWD] acquires water from various sources at its own expense and discharges it

---

[1] The uncodified Act is Chapter 40 of the Water Code Appendix. Undesignated section references that follow are to the Act as reprinted in West's Annotated California Water Code Appendix.

3

from [OCWD] facilities in Orange County. This process replenishes or 'recharges' groundwater in the [Basin]. . . . [¶] . . . [¶] [OCWD's] recharge activities effectively store water in the groundwater basin, but [OCWD] does not itself use or extract groundwater. Other entities, such as [Irvine Ranch], operate extraction wells and produce water for public drinking water supplies and for other uses." (*Orange Co. Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 358-359.) Irvine Ranch and similar entities are therefore often referred to as "producers" of water.[2] (Wat. Code, § 60021.)

As we shall discuss in more detail, producers collectively pump the majority of their water from the Basin, but they also rely on other sources. Because it generally costs producers less to pump groundwater than to purchase water imported from outside the Basin, the Act empowers OCWD to impose limitations on, and disincentives to, groundwater extraction. (§ 40-31.5, subd. (a).)

Pursuant to the Act, OCWD commissions a report each year evaluating, among other things, the amount and cost of water produced from Basin groundwater and "supplemental sources" in the prior year, the condition of groundwater supplies in the Basin, and the probable availability of water from supplemental sources in the next water year. (§ 40-31.5, subd. (d).) Following a public hearing at which interested parties may

_____

[2]    In addition to Golden State, the producer Real Parties in Interest in this case are East Orange County Water District, Yorba Linda Water District, Mesa Water District, and the City of Anaheim. We shall refer to them collectively as the Other Producers.

4

comment on the report (§ 40-31.5, subd. (e)), OCWD holds another public hearing at which the board of directors determines whether to use certain Basin management tools in the upcoming year, including "basin equity assessments and . . . production requirements and limitations . . . ."  (§ 40-31.5, subd. (f)(1).)

This case chiefly concerns basin equity assessments and the formula used to determine the amount of an assessment for producers.  Following the public hearings just described, OCWD's board of directors may establish the next year's "basin production percentage," which is "the ratio that all water to be produced from groundwater supplies within the district bears to all water to be produced by persons and operators within the district from supplemental sources and from groundwater within the district during the ensuing water year."  (§ 40-31.5, subds. (c)(2), (g)(2)(b).)  In language important to resolution of this appeal, the Act defines "supplemental sources" as "sources of water outside the watershed of the Santa Ana River, excepting that portion of that watershed on and along Santiago Creek upstream of the downstream toe of the slope of the Villa Park Flood Control Dam, such as, but not limited to, water produced from the Metropolitan Water District of Southern California."  (§ 40-31.5, subd. (c)(1).)

The basin production percentage does not establish a hard cap on the amount of Basin groundwater that producers may pump (either collectively or individually).  Producers, however, are subject to an assessment or rebate based on whether their actual basin production percentage is greater or less than the prescribed basin production percentage.  (§ 40-31.5, subds. (j)(2)-(3)(A).)  As stated in the Act, proceeds from these assessments "shall be used to equalize the cost of water to all persons and operators within the district and to acquire water to replenish the

5

groundwater supplies of the district." (§ 40-31.5, subd. (b).) Thus, in theory, once a producer exceeds the basin production percentage and begins to incur an additional charge for groundwater (i.e., the basin equity assessment), groundwater will no longer be cheaper than imported water and the producer may therefore decide to obtain water from another source. Conversely, any producer that does not or cannot pump up to the basin production percentage (OCWD has, for instance, imposed additional limits on pumping in certain parts of the Basin to mitigate seawater intrusion) will receive a rebate.

The basin equity assessment rate may vary from year to year, it need not be uniform among producers, and, for an individual producer, it may vary between water used for irrigation and non-irrigation purposes. (§ 40-31.5, subds. (g)(2)(E)-(F).) The amount of an individual producer's basin equity assessment is determined by multiplying the amount by which the producer's groundwater production exceeds the basin production percentage by the applicable basin equity assessment rate.[3] (§ 40-31.5, subd. (j)(2).)

This is all a bit obscure, so we shall briefly recapitulate the key points in what we have said so far. One of OCWD's tools for managing the Basin is a system of incentives encouraging

---

[3] The rebate due to a producer whose mix of Basin groundwater and water from supplemental sources puts them below the basin production percentage is "determined by the number of acre-feet by which the production of the person or operator from groundwater as required by the district is less than the acre-foot equivalent of the basin production percentage multiplied by the basin equity assessment rate applicable to that person or operator." (§ 40-31.5, subd. (j)(3).)

6

producers to produce some share of their water from "supplemental sources." Each year, OCWD sets a target ratio describing the ideal proportion of production of water from groundwater and from supplemental sources. That is the basin production percentage. Individual producers who exceed this target (i.e., produce more water from groundwater than OCWD's determined target groundwater level) pay a basin equity assessment based on the amount by which their groundwater production exceeds the target.

Whether a particular water source is classified as a supplemental source has consequences for an individual producer and for the Basin as a whole. First, the classification may impact the Basin-wide target. If OCWD counts water from a particular source as a "supplemental source," the expected ratio of water produced from groundwater to water produced from groundwater *plus* supplemental sources will be lower and the basin production percentage will be set lower. If OCWD does not count the source as among the "supplemental sources," the basin production percentage will be set higher. For producers making use of the source in question, all other things being equal, more water produced from supplemental sources means a lower basin production percentage and a correspondingly lower basin equity assessment (if any).

B. *Irvine Ranch's Water Recycling Activities*

Irvine Ranch serves approximately 108,000 water service connections within an area that includes all of Irvine; parts of Tustin, Newport Beach, Costa Mesa, Orange, and Lake Forest; and unincorporated areas of Orange County. Since the 1960s, Irvine Ranch has spent millions of dollars building and

7

maintaining a water recycling system. It currently operates two water recycling facilities: the Michelson Water Recycling Plant in Irvine and the Los Alisos Water Recycling Plant in Lake Forest.[4] These facilities collect and treat wastewater from sources within Irvine Ranch's service area. During the 2015-2016 water year, these facilities together produced more than 22,000 acre feet of recycled water.

Since at least 2013, Irvine Ranch has taken the position that the water it recycles should be classified as supplemental source water in calculating its basin equity assessment. The interpretive dispute hardened in April 2016, when Irvine Ranch sent OCWD a letter protesting the agency's determination that recycled water does not qualify as a supplemental source. Irvine Ranch argued its recycled water qualifies as water from a supplemental source under the Act because it is outside the watershed of the Santa Ana River. Specifically, Irvine Ranch contended the Act's definition of "supplemental sources" as "sources of water outside the watershed of the Santa Ana River" should be understood to mean water that is not taken from a source that flows to the replenishment of the groundwater basin. Because the wastewater treated at Irvine Ranch's recycling facilities is not taken from such a source (the water would otherwise flow through sewer pipes to the ocean), Irvine Ranch asserted the water it recycles must be a supplemental source. OCWD rejected this understanding of the Act.

---

[4]     Irvine Ranch does not dispute that both facilities are located within the Santa Ana River watershed as understood to refer to the area in which water drains into the Santa Ana River.

C. *Irvine Ranch's Petition and Complaint, Other Producers' Cross-Complaints, and the Trial Court's "Phase One" Ruling*

At its meeting in April 2016, OCWD's board of directors adopted Resolution No. 16-4-37 (the 2016 Resolution) establishing the basin production percentage and setting basin equity assessment rates for the upcoming water year. A couple months later, Irvine Ranch filed a petition and complaint challenging the 2016 Resolution because OCWD did not count recycled water as a supplemental source in calculating the basin production percentage. When OCWD adopted a similar resolution the following year, Resolution No. 14-4-25 (the 2017 Resolution), Irvine Ranch filed an amended petition and complaint challenging that resolution as well.[5] Beyond challenging the classification of recycled water, Irvine Ranch also sought a declaration of its right to pump up to 4,500 acre feet of Basin groundwater for export to customers outside OCWD boundaries pursuant to a judgment entered in 1933.

The Other Producers (see footnote 2, ante) who do not operate water recycling facilities in the Basin intervened and filed cross-complaints for declaratory relief that asked the court

---

[5] Later in 2017, OCWD adopted Resolution No. 17-11-151 (the Corrective Resolution) correcting "clerical errors" in findings in the 2016 and 2017 Resolutions that included recycled water in a figure reflecting water from supplemental sources. The error in the findings did not impact the basin production percentage calculations, which did not count recycled water as water from a supplemental source. Irvine Ranch responded by filing a third amended petition and complaint (the Third Petition) that added a challenge to the Corrective Resolution.

9

to reject Irvine Ranch's construction of a "supplemental source" and Irvine Ranch's claim to water rights arising from the 1933 judgment.  As we shall discuss in more detail, Golden State contends its cross-complaint also sought additional relief concerning its own water rights.

The Third Petition was tried in multiple phases pursuant to the parties' stipulation.

The first phase addressed the Third Petition's first through fourth causes of action that respectively sought: (1) a writ of mandate compelling OCWD to re-calculate the basin equity assessment owed for 2016-2017 and 2017-2018 with recycled water counted as a supplemental source; (2) a writ of mandate compelling OCWD to rescind the Corrective Resolution based on procedural objections and because it excluded recycled water from the class of supplemental sources; (3) invalidation of the 2016 and 2017 Resolutions because they excluded recycled water from the class of supplemental sources; and (4) a writ of mandate compelling OCWD to rescind the 2016 and 2017 Resolutions and conform its actions to an interpretation of the Act classifying recycled water as a supplemental source.  The first phase also addressed the Other Producers' causes of action for declaratory relief related to the classification of recycled water.

Following a hearing in June 2018, the trial court issued a Phase One ruling rejecting Irvine Ranch's construction of the Act's definition of a supplemental source and siding with OCWD and the Other Producers' understanding of the term.  Relying on the plain text of the Act, the court found the definition of "supplemental sources" ("sources of water outside the watershed of the Santa Ana River, excepting that portion of that watershed on and along Santiago Creek upstream of the downstream toe of

10

the slope of the Villa Park Flood Control Dam . . .") did not include water recycled in the Santa Ana River watershed. Citing dictionary definitions of "watershed" and "outside," the trial court reasoned the phrase "outside the watershed" is used in a geographic rather than a hydrologic sense, meaning that wastewater within the geographic bounds of the Santa Ana River watershed is not water from a supplemental source simply because it does not drain into the river. The court further explained that the statutory definition's exclusion of a "portion of th[e] watershed on and along Santiago Creek" was "consistent with a perception that the watershed is a geographical area of land" because "land can be apportioned" but "[a] system of drainage" cannot. The court additionally emphasized that the only other use of the term "watershed" elsewhere in the Act concerns OCWD's power to take property "located within" and "at any place" within the watershed by eminent domain, which again supported a geographical understanding of the term watershed as used in the supplemental sources definition.[6]

Although the trial court believed there was no need to consider historical revisions to the Act, it explained that doing so

---

[6] The court conceded "it would have been more enlightened for the Legislature to define 'sources of water outside the watershed' to mean water from any source other than the waters draining into the Santa Ana River," but it concluded the clear and unambiguous text of the Act demonstrated a contrary intent. The trial court rejected the contention that its construction led to absurd results because, among other things, a geography-focused definition of supplemental sources increases certainty in a scheme that incentivizes purchase of water from sources outside the geographic bounds of the Santa Ana River watershed.

would only support its plain text conclusion.  As the court detailed, the Act's definition of "supplemental sources" was amended in 1991 to include "reclaimed water,"[7] but that provision was removed just a few years later.  The trial court found this significant in two respects.  First, the later "decision to delete 'reclaimed water' . . . signified an intention to exclude recycled water from the definition of 'supplemental sources.'"  But, second, even during the short period when the reference to reclaimed water remained in the definition of supplemental sources, the definition still distinguished between reclaimed water and sources of water outside the watershed of the Santa Ana River because it "defin[ed] supplemental sources to mean 'reclaimed water *and* sources of water outside the watershed of the Santa Ana River'" as opposed to "'sources of water outside the watershed of the Santa Ana River *including* reclaimed water.'"[8]

### D.  *Subsequent Proceedings*

The only subsequent trial phase that is relevant for our purposes in this appeal is phase three, which addressed Irvine

---

[7]  The Water Code uses the phrases "reclaimed water" and "recycled water" interchangeably.  (Wat. Code, § 26.)

[8]  Over the course of the proceedings, Irvine Ranch filed additional petitions and complaints, all of which were consolidated with the original matter.  As pertinent here, these pleadings challenged OCWD's continuing practice of excluding recycled water from supplemental sources.  Based on the trial court's Phase One ruling, the parties stipulated to the denial of all causes of action in Irvine Ranch's petitions and complaints that rely on its construction of "supplemental sources" in the Act.

Ranch's alleged rights under a 1933 judgment and Golden State's purported claims for relief concerning its own water rights.

In a seventh amended supplemental petition and complaint, Irvine Ranch sought a declaration that it is entitled to pump and export a certain amount of groundwater without being assessed a surcharge based on a judgment in favor of The Irvine Company, its predecessor in interest, in 1933. In their cross-complaints, the Other Producers sought opposing declarations that Irvine Ranch has no such right. Golden State contends it also sought additional relief by way of two claims in its own cross-complaint: a third cause of action for declaratory relief "pertaining to the rights of the parties to groundwater underlying the Basin pursuant to the 1933 judgment" and a fourth cause of action to enjoin Irvine Ranch "from extracting non-surplus water under a claim of water rights from the 1933 [j]udgment, or any other claim under applicable law, in a manner that causes harm to [Golden State] and the Basin."

After asserting its declaratory relief claim, Irvine Ranch discovered that The Irvine Company abandoned its rights under the 1933 judgment prior to the alleged transfer of rights to Irvine Ranch. Upon discovery of this fact, Irvine Ranch moved to dismiss the relevant cause of action seeking declaratory relief concerning its purported rights under the 1933 judgment and stipulated to declaratory relief in favor of each of the Other Producers—except Golden State, which was attempting to assert its own water rights—on their corresponding cross-claims.

Irvine Ranch filed a motion for judgment on the pleadings to terminate the litigation as to Golden State. Irvine Ranch argued Golden State was entitled to declaratory relief that Irvine Ranch had no rights under the 1933 judgment but there was no

13

need for injunctive relief. Irvine Ranch also argued Golden State was not entitled to declaratory relief beyond what Irvine Ranch conceded because there was no longer any case or controversy concerning the parties' water rights and, in any case, Golden State had not joined all parties necessary for an adjudication of its own water rights. Golden State argued in opposition that its claims did not depend on Irvine Ranch's claim under the 1933 judgment, it was entitled to a declaration of its rights in relation to Irvine Ranch, and this relief did not require any other parties to be named.

The trial court granted Irvine Ranch's motion for judgment on the pleadings following a hearing. The court recognized it confronted a "very odd motion" in which Irvine Ranch was "insisting that [it] lose on a cross-complaint and [Golden State] insisting that it not win." But the court believed the matter "c[ame] down to" a careful reading of Golden State's cross-complaint, which made "pretty clear that the third cause of action is about rights under the 1933 judgment." It was "[l]ikewise[ ] clear as well that [the fourth cause of action] is . . . about the 1933 judgment." The trial court accordingly issued an order declaring Irvine Ranch does not possess any rights under the 1933 judgment, declining to "issue declaratory or injunctive relief as to any aspect of groundwater rights that may be held by [Golden State] . . . as such relief is beyond the scope of [Golden State's] Fourth Amended Cross-Complaint," and denying Golden State injunctive relief "because there is no present demonstrated need for such relief in light of the judicial declaration" it granted. The trial court emphasized the judgment to be entered "shall not prejudice [Golden State's] groundwater rights, if any, or [Golden

14

State's] right, if any, to challenge groundwater rights asserted by others."

Following the trial court's ruling on the motion for judgment on the pleadings, all parties stipulated to entry of a final judgment consistent with their earlier stipulations and the court's prior orders. Irvine Ranch now appeals the Phase One ruling that recycled water in the Basin is not a supplemental source and Golden State appeals the order granting Irvine Ranch's motion for judgment on the pleadings.

## II. DISCUSSION

The sole issue Irvine Ranch raises in its appeal is whether the phrase "sources of water outside the watershed of the Santa Ana River" refers to water coming from outside the area of land in which water drains into the Santa Ana River or, as Irvine Ranch prefers, any water outside the "drainage system" flowing into the Santa Ana River and replenishing the Basin. Our review is de novo, and we hold the text of the Act clearly employs the term "watershed" to describe a geographical area. The unambiguous statutory text obviates any need to delve into earlier revisions to the Act, but, as the trial court explained, that history would only confirm what we hold based on the text of the statute alone.

In its cross appeal challenging the order granting Irvine Ranch's motion for judgment on the pleadings, Golden State contends its cross-complaint raised claims unrelated to the 1933 judgment and, in any case, the trial court abused its discretion in denying it leave to file an amended complaint asserting such claims. Both arguments lack merit. The operative cross-complaint reveals Golden State was asserting its rights vis-à-vis

15

Irvine Ranch only with respect to the 1933 judgment.  In addition, any amendment to seek a broader declaration as to the priority of any appropriative right possessed by Golden State relative to Irvine Ranch (or related injunctive relief) would be futile because there is no actual controversy.

> A. *The Phase One Ruling Is Correct Because Recycled Water Is Not Water from a Supplemental Source Under the Act*
> 1. *Plain meaning*

The Act defines "supplemental sources" to mean "sources of water outside the watershed of the Santa Ana River, excepting that portion of that watershed on and along Santiago Creek upstream of the downstream toe of the slope of the Villa Park Flood Control Dam, such as, but not limited to, water produced from the Metropolitan Water District of Southern California." (§ 40-31.5, subd. (c)(1).)

To decide whether Irvine Ranch is correct that the water it recycles falls under this definition, we begin with "the words of a statute, 'because they generally provide the most reliable indicator of legislative intent.' [Citation.]" (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529.)  "We do not consider statutory language in isolation; instead, we examine the entire statute to construe the words in context.  [Citation.]  If the language is unambiguous, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.'  [Citation.]  'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public

16

policy.' [Citation.]" (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 972.)

Absent any indication the Legislature intended a word or phrase to be read in a special or technical sense, we give the statutory language its """plain and commonsense meaning.""" (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616; *Turo Inc. v. Superior Court* (2022) 80 Cal.App.5th 517, 521.) "Courts appropriately refer to dictionary definitions 'to ascertain the ordinary, usual meaning of a word.' [Citation.]" (*Ibid.*)

Here, the Act does not define "watershed," and there is no indication the Legislature intended the term to have a technical or special meaning. Dictionary definitions of "watershed" emphasize its spatial character. The Oxford English Dictionary, for example, defines it as either "3. . . . (a) The *slope* down which the water flows from a water-parting[ or] (b) the *gathering ground* of a river system; a *catchment area or drainage basin.*"[9]

---

[9] In addition to this definition and various figurative uses, there is another geographic sense of "watershed" that does not apply here: "1.a. The line separating the waters flowing into different rivers or river basins; a narrow elevated tract of ground between two drainage areas; a water-parting." (Oxford English Dict. Online (2015) <https://www.oed.com/dictionary/watershed_n1?tab=meaning_and_use#15070030> [as of May 22, 2024]; accord Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/watershed> [as of May 24, 2024] ["Opinion on the literal geographic meaning of *watershed* is divided. On one side of the debate are those who think the word can only refer to a ridge of land separating rivers and streams flowing in one direction from those flowing in the opposite direction. That's the term's original meaning, one probably borrowed in the translation of the German *Wasserscheide*. On

(Oxford English Dict. Online (2015) <https://www.oed.com/dictionary/watershed_n1?tab=meaning_and_use#15070030> [as of May 22, 2024], emphasis added.) Merriam-Webster likewise defines "watershed" to mean "a *region or area* bounded peripherally by a divide and draining ultimately to a particular watercourse or body of water." (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/watershed> [as of May 24, 2024], emphasis added.) These definitions make clear that hydrologic features may help define the area of a watershed, but they do not constitute the watershed itself.

The geographic character of the term "watershed" is underscored in the Act's exception to the general rule that only sources of water outside the watershed of the Santa Ana River qualify as supplemental sources. In deference to vested water rights, the Act provides that "supplemental sources" include sources of water within "that portion of that watershed on and along Santiago Creek upstream of the downstream toe of the slope of the Villa Park Flood Control Dam . . . ." (§ 40-31.5, subd. (c)(1).) If "watershed" referred to the Basin's drainage system, the exception would simply refer to Santiago Creek upstream of the dam; there would be no need to specify "that portion of that watershed on and along" the creek. Indeed, it would make little sense to speak of a source of water "on and along" a source of water.[10]

---

the other side of the argument are those who think *watershed* can also apply to the area through which such divided water flows. The latter sense is now far more common in America"].)

[10]    Irvine Ranch attempts to turn this argument on its head, suggesting it is nonsensical to read "watershed" in a manner such

Irvine Ranch suggests that if the Legislature had intended to define supplemental sources as those outside a geographic area, it would have described the boundaries by metes and bounds as it did in describing OCWD's boundaries in section 40-1. There is no indication, however, that OCWD's boundaries are identical to those of the watershed. The Legislature might well have decided the need for immediate certainty as to OCWD's boundaries dictated a metes-and-bounds approach but left the term "watershed" to speak for itself.

Venturing beyond section 40-31.5, the Act also uses the term "watershed" in a geographic sense in its provision for OCWD's exercise of eminent domain. In section 40-2, subdivision (10), the Act authorizes OCWD "[t]o exercise the right of eminent domain to take any property necessary to the exercise of any of the powers granted by this act, except that the district shall not have the right of eminent domain as to water, water rights, reservoirs, pipelines, water distributing systems, waterworks, or powerplants, all or any of which are already devoted to beneficial or public use and *located within the watershed* of the Santa Ana River . . . . No language or provision of this act . . . shall be interpreted or construed so as to limit or abridge the right of the district . . . to exercise its right of eminent domain to condemn

---

that the exception may be paraphrased to refer to sources of water within "that portion of th[e] [land] on and along Santiago Creek" upstream of the dam. We fail to see the absurdity. Irvine Ranch believes "no person would use the word 'land' to describe a body of water (essentially equating land with water)," but that is not what the statutory text does. Both the text and Irvine Ranch's paraphrase simply refer to sources of water by their spatial location.

property *at any place within the Santa Ana River watershed* for rights-of-ways upon and across and under which to construct pipelines, conduits, tunnels and/or aqueducts necessary or convenient for any of the purposes of the district . . . ." (Emphasis added.)

There is good reason to understand the reference to watershed in the supplemental sources definition in this same geographic sense. (See, e.g.*, People v. Partee* (2020) 8 Cal.5th 860, 868 ["'One of the fundamental rules of statutory construction is that interrelated statutory provisions should be harmonized and that, to that end, the same word or phrase should be given the same meaning within the interrelated provisions of the law.' [Citation]"]; *Walker v. Superior Court* (1988) 47 Cal.3d 112, 132.) Although "'[w]hen the occasion demands it, the same word may have different meanings to effectuate the intention of the act in which the word appears'" (*People v. Hernandez* (1981) 30 Cal.3d 462, 468), this occasion makes no such demand. It is not reasonable to suppose the Legislature used "watershed" in its standard, dictionary sense in one part of the Act and silently adopted a non-standard usage in another—particularly where alternatives were readily available.

Notwithstanding this textual evidence, Irvine Ranch contends the term "watershed" must be understood to refer to a "water system" in order to "fulfill the undisputed statutory purpose underlying the [basin equity assessment]—to discourage the overproduction of local groundwater supplies by encouraging the use of sources of water that are not part of the watershed's drainage system that replenishes the Basin." Even if a geographic reading of "watershed" results in a smaller *set* of "supplemental sources," however, this does not necessarily mean

20

there will not be enough water from the remaining supplemental sources to achieve the Basin-wide basin production percentage. In other words, there is no indication that Irvine Ranch's proposed construction of "watershed" is the *only* construction that protects against over-production of groundwater from the Basin.[11]

At a more fundamental level, Irvine Ranch's statement of the Act's purpose falsely suggests natural re-charge by the watershed's drainage system is the sole means by which the Basin is replenished. Far from passively relying on natural re-charge, however, the Basin is a heavily managed underground reservoir into which OCWD pumps a substantial amount of imported water. Counting recycled water as a supplemental source would permit Irvine Ranch to pump *more* groundwater while depriving OCWD of revenue needed to buy imported water to replenish the Basin (or else forcing other producers to shoulder those costs). (§ 40-31.5, subd. (b) ["The proceeds of the basin equity assessments imposed and collected shall be used to equalize the cost of water to all persons and operators within the district and to acquire water to replenish the groundwater supplies of the district"].)

Irvine Ranch's further argument that a geographic understanding of "watershed" leads to absurd results also lacks merit. Although "we 'will not give statutory language a literal meaning if doing so would result in absurd consequences that the Legislature could not have intended,'" "troubling" consequences are not absurd. (*In re D.B.* (2014) 58 Cal.4th 941, 946, 948.) "To

---

[11]    Irvine Ranch's implied assertion that the Act should be amended to provide stronger incentives to the development and use of recycled water is properly addressed to the Legislature.

21

justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them. [Citation.]" (*Id.* at 948.) Here, Irvine Ranch contends that reading "watershed" in a geographic sense would permit a producer to pipe wastewater from within the watershed to a recycling facility outside the watershed and call it supplemental water. Nothing in our opinion today, however, decides whether transporting wastewater outside the watershed for treatment is sufficient to transmute it into supplemental source water. No absurd results follow from construing "sources of water outside the watershed" to exclude Irvine Ranch's recycled water that is captured, treated, and produced within the watershed.

### 2. History of statutory revisions

The Act's unambiguous meaning governs in this case, and we have no need to consider legislative history as an additional aid to construction. (*Kirzhner, supra,* 9 Cal.5th at 972.) But even if the statute were determined to be ambiguous in its use of "watershed," a survey of past revisions to the statute overwhelmingly supports reading the term in a geographic sense, as we have done.[12]

In 1991, the Legislature amended the definition of "supplemental sources" in section 40-31.5 to include "*reclaimed water and* sources of water outside the watershed of the Santa

---

[12] Finding ambiguity (where none exists) would also raise the question of whether OCWD's understanding of supplemental sources would merit some deference. (See, e.g., *McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227.)

Ana River, excepting that portion of that watershed on and along Santiago Creek upstream of the downstream toe of the slope of the Villa Park Flood Control Dam, such as, but not limited to, water produced from the Metropolitan Water District of Southern California." (Stats. 1991, ch. 105, § 1, emphasis added.) Minutes of a 1991 meeting of OCWD's Board of Directors reflect that it sought this amendment to incentivize producers to purchase recycled water processed at an OCWD facility at a rate higher than that charged for groundwater.[13]

Significantly, the 1991 amendment did not list reclaimed water as another example of "sources of water outside the watershed of the Santa Ana River" alongside water purchased from the Metropolitan Water District. Instead, reclaimed water was listed as a separate category of water. Thus, pursuant to the 1991 amendment, reclaimed water's status as a supplemental source did not rest on its being outside the watershed and Legislature evidently did not regard all wastewater as water outside the watershed. The 1991 amendment accordingly refutes Irvine Ranch's view that any water not draining into the Santa Ana River is outside the watershed.[14]

---

[13] At oral argument, counsel for Irvine Ranch conceded its recycled water was classified as a supplemental source while this amendment was in effect.

[14] Irvine Ranch attempts to harmonize the 1991 amendment with its construction of "watershed" by arguing that because *some* treated wastewater is (or at least was) discharged into the Santa Ana River, the 1991 amendment had to list reclaimed water as a standalone category in order "to treat *all* reclaimed water as a [s]upplemental [s]ource." This argument makes no practical sense. It would be impossible for OCWD to track a producer's use of water entering the Basin in this manner and

In 1995, the Legislature deleted the language added by the 1991 amendment. (Stats. 1995, ch. 29, § 6.) The Legislature's reversion to the pre-1991 definition compels the inference that reclaimed water is no longer categorically supplemental source water. (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 170 ["When the Legislature alters statutory language, 'as for example when it deletes express provisions of the prior version,' the presumption is that it intended to change the law's meaning"].) It is not reasonable to suppose the Legislature added a provision categorically identifying reclaimed water as a supplemental source and subsequently deleted that provision because it believed the pre-existing "outside the watershed" provision had the same effect.

Irvine Ranch nonetheless argues the significance of 1995 amendment is unclear because the Legislature could have "use[d] words of exclusion . . . to effectuate an exclusion of all reclaimed water from the definition of [s]upplemental [s]ource . . . ." But this point is not relevant to the dispute before us. OCWD's construction of the Act to exclude recycled water generated and treated within the watershed as a supplemental source does not imply that recycled water generated and/or treated outside the watershed is not water from a supplemental source.[15]

---

credit it as water from a supplemental source. Wastewater that percolates into the Basin is just groundwater, and the 1991 amendment was not structured to incentivize its production.

[15] Irvine Ranch's related contention that the Legislature did not signal any "intention to effectuate a major policy reversal" going "from an amendment (1991) including *all* recycled water in Section 31.5(c)(1) to an amendment *excluding all* recycled water" is misplaced for the same reason. Similarly, Irvine Ranch's

Because the history of revisions to section 40-31.5 only confirms what we have already concluded looking to the text of the statute, we hold the trial court correctly determined Irvine Ranch's recycled water is not from a supplemental source.[16]

> B.     *The Trial Court Properly Granted Irvine Ranch's Motion for Judgment on the Pleadings as to Golden State's Cross-Complaint*
>
> 1.     *Legal framework*

"'A motion for judgment on the pleadings, like a general demurrer, tests the allegations of the complaint or cross-complaint, supplemented by any matter of which the trial court takes judicial notice, to determine whether [the] plaintiff or cross-

---

emphasis of excerpts from analyses of the 1995 amendment characterizing it as making "technical" changes to the Act does not diminish its significance because these same documents highlight the substantive impact on the definition of supplemental sources.  For example, a Senate Rules Committee analysis includes a "[d]igest" indicating the 1995 amendment "make[s] technical changes to the [Act], as specified," but goes on to explain that it would "[r]emove[ ] reclaimed water from the definition of supplemental sources."  (Sen. Rules Com., Off. of Sen. Floor Analyses, Assem. Bill No. 1140 (1995-1996 Reg. Sess.), as amended Apr. 17, 1995.)

[16]     In a footnote near the end of its opening brief, Irvine Ranch asks us to reverse the trial court's order striking certain evidence submitted with its reply brief.  Irvine Ranch does not describe the evidence, discuss how it relates to the issues on appeal, or otherwise make any attempt to carry its burden to demonstrate how it was prejudiced by the purported error.  The point is insufficiently presented and waived.

complainant has stated a cause of action.  [Citation.]  Because the trial court's determination is made as a matter of law, we review the ruling de novo, assuming the truth of all material facts properly pled.' [Citation.]" (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166.)

"'Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion.' [Citation.]" (*Brooklyn Restaurants, Inc. v. Sentinel Ins. Co., Ltd.* (2024) 100 Cal.App.5th 1036, 1043.)  "An abuse of discretion occurs if "'there is a reasonable possibility that the defect can be cured by amendment."' [Citations.]" (*Starlight Cinemas, Inc. v. Massachusetts Bay Ins. Co.* (2023) 91 Cal.App.5th 24, 32.)

### 2. *Golden State's operative complaint did not assert claims unrelated to the 1933 judgment*

As we have already mentioned, Golden State's operative cross-complaint included a third cause of action for declaratory judgment and a fourth cause of action for injunctive relief. Golden State contends each cause of action addressed both Irvine Ranch's purported water rights under the 1933 judgment and its own allegedly prior appropriative rights.  We construe the allegations liberally (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 272), but even so construed, these causes of action only concern Golden State's rights in relation to Irvine Ranch's abandoned claims under the 1933 judgment.

The third and fourth causes of action in Golden State's cross-complaint incorporate preceding portions of the cross-complaint by reference.  In the first paragraph of the cross-complaint, Golden State explains that it "seeks to constrain the rights of [Irvine Ranch] to take or export water from the Basin to

26

the detriment of [Golden State] . . . as specifically set forth herein in accordance with the principles set forth by the California Supreme Court in *Tulare Irrigation District v. Lindsay-Strathmore Irrigation District* (1935) 3 Cal.2d 489 [(*Tulare*)] and its progeny." Golden State emphasizes the complaint "does not contest or seek to declare the water rights of the [Other Producers] in this case or [OCWD], and should not be construed as a request for a general adjudication of water rights in the Basin or to quiet title thereto."

Golden State mentions its own water rights in paragraphs 19 and 20 of the cross-complaint. It alleges it "has been continuously and without interruption pumping groundwater from the Basin and distributing the water for reasonable and beneficial use since well before 1933" and "[a]s between [Irvine Ranch] and [Golden State], the entirety of [Golden State's] use has a priority date arising before 1933 based upon the doctrine of 'gradual development' under its continuous and uninterrupted application of water to a public use." In paragraphs 40 and 42, Golden State alleges Irvine Ranch's "claimed right to groundwater in the Basin, whatever it may be, is junior in time and priority to [Golden State's]" and California law "prevented any rights acquired by [Irvine Ranch], whatever they may be, from diminishing the pre-existing rights held by [Golden State]." In paragraph 45, Golden State alleges that "[e]ven if [Irvine Ranch] acquired water rights under the 1933 Judgment, [Golden State's] rights in the Basin are paramount to any water rights [Irvine Ranch] acquired under the 1933 Judgment or otherwise relegated to a junior priority in favor of the intervening-public use of [Golden State] and other public water suppliers."

27

Golden State's third cause of action for declaratory relief alleges "[a]n actual, present, and justiciable controversy now exists between the parties regarding substantial questions pertaining to the rights of the parties to groundwater underlying the Basin *pursuant to the 1933 judgment*." (Emphasis added.) Golden State alleges Irvine Ranch has no rights under the 1933 judgment and, even if it did, any "attempt to exercise those rights, or any other rights it may claim under applicable law, by using non-surplus water outside the Basin without offsetting such use by an equal amount of imported water constitutes an unlawful export." Golden State next states in paragraph 55 of the cross-complaint that it "desires a judicial determination and declaration (1) as to the validity of its assertions set forth above as to [Irvine Ranch's] rights exclusively under the 1933 Judgment and (2) as to the validity of [Golden State's] appropriative water rights to pump groundwater from the Basin." The next paragraph indicates that "[i]f the Court finds that [Irvine Ranch] has acquired and maintained a right to pump and export groundwater from the Basin arising under the 1933 Judgment, [Golden State] seeks a declaration that it is not bound by the 1933 Judgment and that the rights of [Golden State] are paramount to [Irvine Ranch's] rights to take surplus water arising under the 1933 Judgment."

Golden State points to language in paragraph 55 (desiring a judicial declaration "as to the validity of [its] appropriative water rights to pump groundwater from the Basin") as a request for a declaration of its rights independent of Irvine Ranch's rights under the 1933 judgment. The conditional framing of the subsequent paragraph, however, makes clear that it sought a declaration of its rights only if the trial court determined Irvine

28

Ranch had rights under the 1933 judgment. The prayer for relief is framed in the same manner.[17]

Golden State's emphasis on its allegations that its water rights have priority over *any* rights claimed by Irvine Ranch—based on the 1933 judgment or otherwise—does not indicate Golden State sought a more general declaration. Putting aside Irvine Ranch's failed challenge to OCWD's construction of the Act and its abandoned claim to rights under the 1933 judgment, there are no allegations that Irvine Ranch asserted any rights that would disrupt OCWD's management of the Basin in accordance with the Act. Because the relative priority of the parties' water rights does not matter under this regime and Golden State's cross-complaint expressly disclaims any intent to alter this regime, the cross-complaint cannot be read to seek a declaration of Golden State's rights except in relation to Irvine Ranch's rights under the 1933 judgment.[18]

---

[17] Paragraph three in the prayer for relief requests "[t]hat the Court declare and enter judgment determining that IRWD has no present valid right to pump and export groundwater from the Basin arising from the 1933 Judgment and that [Golden State] holds appropriative water rights to pump groundwater from the Basin and devoted that water to a public use[.]" Paragraph four requests "[i]f the Court finds that IRWD has acquired and maintained a right to pump and export groundwater from the Basin arising under the 1933 Judgment, that the Court declare and enter judgment that [Golden State's] rights to produce groundwater from the Basin are paramount to any rights, whatever they may be, that IRWD may have to export groundwater from the Basin arising under the 1933 Judgment[.]"

[18] Golden State contends Irvine Ranch's motion for judgment on the pleadings was the wrong vehicle to "surgically target[ ]

29

The fourth cause of action for injunctive relief also fails to state a cause of action in light of Irvine Ranch's concession that it has no rights under the 1933 judgment. After reciting allegations that Irvine Ranch "claims the right to extract and export Basin water under the 1933 Judgment" and "unless restrained . . . , [Irvine Ranch] will export non-surplus water under the 1933 Judgment," the cross-complaint asserts "[Irvine Ranch] must be enjoined from extracting non-surplus water under a claim of water rights from the 1933 Judgment, or any other claim under applicable law, in a manner that causes harm to [Golden State] and the Basin." Again, notwithstanding Golden State's emphasis on its request concerning "any other claim under applicable law," there are no allegations that Irvine Ranch asserted any other claim that would disrupt the status quo.

### 3. *The trial court did not abuse its discretion in denying Golden State leave to file an amended cross-complaint*

A trial court does not abuse its discretion in denying leave to amend where, in all probability, amendment would be futile. (*Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1000.) Here, it does not appear Golden State can plead an actual

---

parts of [its] [t]hird [c]ause of [a]ction as lacking merit." Code of Civil Procedure section 438, subdivision (c)(2) provides that a motion for judgment on the pleadings may only address a cause of action in its entirety. Because the judgment disposes of all aspects of Golden State's third cause of action—properly construed to address only Irvine Ranch's claim of rights under the 1933 judgment—Golden State's argument lacks merit.

30

controversy supporting declaratory relief or related injunctive relief.[19]

Code of Civil Procedure section 1060 provides, in pertinent part, that "[a]ny person . . . who desires a declaration of his or her rights or duties with respect to another, . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties . . . ."

---

[19] Golden State did not request leave to amend (for the fifth time) in the trial court. In its opening brief on appeal, Golden State suggests it "could have cured any deficiency in the form of [its] [w]ater [r]ights [c]laims by more clearly articulating them as standing separate and apart from IRWD's claims to rights under the 1933 Judgment." We assume solely for the sake of argument that this request is sufficiently detailed to merit discussion. (See generally *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1491 ["'The plaintiff bears the burden of proving there is a reasonable possibility of amendment. [Citation.] . . . [¶] To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] The plaintiff must clearly and specifically set forth the "applicable substantive law" [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.] Allegations must be factual and specific, not vague or conclusionary'"]; *Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 881 ["'While such a showing can be made for the first time to the reviewing court [citation], it must be made'"].)

"""The 'actual controversy' language in Code of Civil Procedure section 1060 encompasses a *probable* future controversy relating to the legal rights and duties of the parties. [Citation.]" [Citation.] It does not embrace controversies that are "conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from the court." [Citation.] Thus, while a party may seek declaratory judgment before an actual invasion of rights has occurred, it must still demonstrate that the controversy is justiciable. [Citation.] And to be justiciable, the controversy must be ripe.' [Citation.] "'To determine whether an issue is ripe for review, we evaluate two questions: the fitness of the issue for judicial decision and the hardship that may result from withholding court consideration.'" [Citation.] The two-pronged test for ripeness has also been described as follows: '(1) whether the dispute is sufficiently concrete so that declaratory relief is appropriate; and (2) whether the parties will suffer hardship if judicial consideration is withheld.' [Citation.]" (*Dominguez v. Bonta* (2022) 87 Cal.App.5th 389, 418.)

Golden State contends it is entitled to a declaration of its water rights relative to Irvine Ranch based on Irvine Ranch's efforts "to alter OCWD's management of the Basin and obtain a 'discrete and specific advantage in the apportionment of water'" through "each of the claims [Irvine Ranch] has pursued in this case—e.g., claims relating to the definition of 'supplemental source' in the . . . Act, the export of water from the Basin, and the 1933 judgment . . . ." This legal maneuvering has not, however, resulted in any advantage to Irvine Ranch relative to other producers in the Basin.

Golden State alternatively contends "the present shortage in the Basin" gives rise to an actual controversy because "if there

is curtailment, as between [Irvine Ranch] and [Golden State], it should follow the common law rule of priority." Golden State argues that, "[a]s the public water supplier for four communities in Orange County, [it] desires certainty as to the existence of its rights and their priority date under the law so that it may plan accordingly."

Even if we assume the possibility of curtailment is more than conjecture, a declaration of Golden State's rights relative to only one of the many other producers in the Basin does not realistically facilitate planning. Golden State's alleged appropriative rights would be of no use—regardless of their priority relative to those of Irvine Ranch—if there is no surplus water in the Basin. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1241 [explaining that only surplus water is subject to appropriative rights].) A declaration of one party's rights relative to another's in a basin is appropriate in some instances. It is no substitute for a basin-wide adjudication, however, where the concern is a general shortage—and Golden State has made clear it is not seeking a basin-wide adjudication. In short, a general shortage of water in the Basin does not give rise to a concrete dispute between Golden State and Irvine Ranch, and withholding declaratory relief will not prejudice Golden State.

Golden State further contends an actual controversy *necessarily* exists where two parties claim groundwater rights in the same basin. That is not our view of the authorities on which Golden State relies. For example, Golden State characterizes *Tulare Irrigation District v. Lindsay-Strathmore Irrigation District* (1935) 3 Cal.2d 489 (*Tulare*) as establishing that "the courts have, since 1935, authorized a plaintiff water right holder

33

to bring an action to protect its rights against continued use by the defendant." In *Tulare*, however, our Supreme Court emphasized that a declaratory judgment concerning the current and prospective reasonable beneficial uses of a riparian landowner protects their rights "against [an] appropriative use ripening into a right by prescription . . . ." (*Id.* at 525.) That is not a risk here, as Golden State observes in its cross-complaint that California Civil Code section 1007 precludes Irvine Ranch from acquiring prescriptive rights at Golden State's expense.[20] Golden State's reliance on *Peabody v. City of Vallejo* (1935) 2 Cal.2d 351 is misplaced for the same reason. (*Id.* at 374 ["the owner [of water rights] is entitled to a judgment declaring his preferential and paramount right and enjoining the assertion of an adverse use *which might otherwise ripen into a prescriptive right*"], emphasis added.)

Other authorities Golden State cites also fail to establish an actual controversy exists between Golden State and Irvine Ranch. The principle that the owner of water rights may "maintain an action to quiet title to [the rights] as against any adverse claimant or to protect [the rights] by obtaining

---

[20]     Civil Code section 1007 provides that "[o]ccupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all, but no possession by any person, firm or corporation no matter how long continued of any land, water, water right, easement, or other property whatsoever dedicated to a public use by a public utility, or dedicated to or owned by the state or any public entity, shall ever ripen into any title, interest or right against the owner thereof."

34

declaratory or injunctive relief *against unlawful infringement of it*" (*Orange County Water District v. City of Riverside* (1959) 173 Cal.App.2d 137, 159, emphasis added) does not aid Golden State because Golden State does not allege unlawful infringement of its rights by Irvine Ranch.  Both *Tehachapi-Cummings County Water District v. Armstrong* (1975) 49 Cal.App.3d 992 and *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266 involved basin-wide (or nearly basin-wide) adjudications of water rights. (*Tehachapi-Cummings, supra*, at 995; *City of Santa Maria, supra*, at 276.)

Because there is no actual controversy warranting a declaration of Golden State's rights relative to Irvine Ranch, there is likewise no threat of harm sufficient to warrant injunctive relief.  (*Costa Mesa City Employees' Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 305-306.)  Golden State does not articulate how Irvine Ranch's continued production of groundwater from the Basin will harm either Golden State or the Basin itself.

DISPOSITION

The judgment is affirmed.  OCWD, East Orange County Water District, Yorba Linda Water District, Mesa Water District, Golden State, and the City of Anaheim are awarded costs on Irvine Ranch's appeal.  Irvine Ranch is awarded costs on Golden State's cross-appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:



MOOR, J.



KIM, J.